UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRADFORD DEAN BOUYE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02968-JMS-MG |
| | ) | |
| MARTZ Lieutenant, | ) | |
| HARRIS[1] Sergeant, | ) | |
| J. WILLIAMS Sergeant, | ) | |
| BYERS Sergeant, | ) | |
| K. ALDERSON Officer, | ) | |
| C. QUARRIER Officer, | ) | |
| K. CARTER Officer, | ) | |
| C. TYLER Officer, | ) | |
| Z. FAWVER Officer, | ) | |
| J. FISH Sergeant, | ) | |
| GUST Nurse, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part Motions for Summary Judgment**

Bradford Dean Bouye, Jr. is an Indiana Department of Correction ("IDOC") inmate. He brings this civil rights action pursuant to 42 U.S.C. § 1983 based on allegations that his constitutional rights were violated when he was injured during a cell extraction and denied medical treatment. Dkt. 15 (Screening Order). Defendants seek summary judgment. For the reasons explained below, their motions, dkts. [88] and [93], are **GRANTED in part** and **DENIED in part**.

**I. Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a

---

[1] Defendant Cooke's last name is now Harris. The **clerk is directed to update the docket accordingly.**

matter of law. *Id.*; *Pack v. Middlebury Comty. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

This case relates to Mr. Bouye's allegations that Defendants used excessive force, failed to intervene, and were deliberately indifferent to his medical needs during a cell extraction on June 28, 2021. The summary judgment record contains video of the incident. "[W]here a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's

version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

## II. Facts

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The following statement of facts has been evaluated pursuant to the standard above. The facts are considered undisputed except where disputes of fact are noted.

### A. The Parties

Mr. Bouye is an IDOC inmate, and at all times relevant to his claims, he was housed at Pendleton. Dkt. 1 (Plaintiff's complaint). At all relevant times, Defendant Jason Gust was employed as a nurse at Pendleton, and the remaining defendants were members of the correctional staff at the facility. Dkts. 90-2, 94-2, 94-3, 94-4, 94-5, 94-7, 94-8, 94-9.

### B. June 28, 2021, Incident

#### 1. Defendants' Affidavits and Medical Records

On June 28, 2021, Defendant Sergeant Christina Harris[2] was stationed at Mr. Bouye's cell block, J-Cellhouse, and informed him he would be moving to G-Cellhouse later that day. Dkts. 94-1 at 45; 94-2 at 1. He responded that he did not want to move and would not. *Id.* Later, a cell extraction team was assembled to forcibly remove Mr. Bouye from J-Cellhouse to G-Cellhouse. Dkt. 94-3 at 1. That team consisted of all defendants except Sergeant Harris. *See* dkts. 94-4, 94-8. Defendant Sergeant Shaye Byers was responsible for recording all times and events on paper

---

[2] The Court refers to this defendant by her current last name.

during the extraction and did not touch Mr. Bouye. Dkt. 94-3 at 1. Defendant Officer K. Alderson was responsible for operating the camera and recording video for the extraction. Dkt. 94-4.

Defendant Sergeant Jacob Williams was the leader of the extraction team; he gave orders to the other team members. Dkt. 94-5. He also ordered Mr. Bouye to "come here" twice and to submit to restraints, with Mr. Bouye refusing. *Id.* In order to gain Mr. Bouye's compliance in submitting to restraints, he sprayed OCV, commonly known as pepper spray, into Mr. Bouye's cell for three seconds. *Id.*  He did not enter the cell. *Id.* Defendant Officer Calvin Quarrier, as the designated first member of the extraction team, was the first officer to enter Mr. Bouye's cell. Dkt. 94-7. Defendants Officer Chadd Tyler, Officer Z. Fawver, and Sergeant J. Fish were also part of the extraction team that entered Mr. Bouye's cell. Dkt. 94-4.

Upon entering the cell, Mr. Bouye "jumped to his feet and rushed towards the team" before throwing "approximately three punches at [Officer Quarrier], striking [him] in the helmet." Dkt. 94-7 at 2. Officer Tyler attempted to grab Mr. Bouye's legs because he had become combative. Dkt. 94-9 at 2. Defendant Officer Brian Martz remained outside the cell with a pepper ball gun. Dkt. 94-8 at 2. When Mr. Bouye jumped to his feet and rushed towards the team, Officer Martz became "concerned for the extraction team's safety" and "positioned the barrel of the pepper ball system through the cell bars and deployed 2-3 rounds" at Mr. Bouye's torso. *Id.*

Mr. Bouye was pushed onto the bed in an attempt to restrain him. Dkt. 94-7 at 2. Officer Quarrier "attempted to stabilize Bouye while other members of the team attempted to place him in restraints." *Id.* However, Mr. Bouye "was aggressively resisting the team's efforts to put him in restraints, and was forcing his way through the door of the cell and onto the range." Dkt. 94-5 at 2; *see also* dkts. 94-7 at 2, 94-8 at 2, 94-9 at 2. When Mr. Bouye reached the door, Officer Martz shot the pepper ball gun at him one or two times in an "attempt to gain Bouye's compliance and

protect the extraction team members from Bouye's violent resistance." Dkt. 94-8 at 8. After he was hit with the pepper balls, Mr. Bouye "lessened his resistance and laid down on the ground on his stomach." Dkt. 94-9 at 2. Officer Tyler then grabbed Mr. Bouye's arm "using joint lock manipulation to place his arm in a position to have wrist restraints applied." *Id.* Officer Quarrier assisted in placing Mr. Bouye's left arm behind his back. Dkt. 94-7 at 2. The team was then able to place Mr. Bouye in wrist and leg restraints. Dkt. 94-9 at 2.

Nurse Gust was the medical team member of the extraction team. Dkt. 94-4. After Mr. Bouye was placed in restraints and escorted down the hall, Nurse Gust "visually assessed him and cleared him to return to his cell." Dkt. 90-2 at 2. Nurse Gust asserts that "[i]f a patient was alert, oriented, speaking clearly, and not showing any signs of distress, emergent intervention in the infirmary would not be indicated." *Id.* After Mr. Bouye was cleared by medical, he was escorted by the extraction team to a shower in G Cellhouse. Dkt. 94-9 at 2. Officer Tyler read the O.C. administrative warning to Mr. Bouye and he was given a decontamination shower. *Id.; see also* dkts. 94-5 at 2, 94-7 at 3, 94-8 at 3. After the shower, Mr. Bouye was escorted to his cell in G Cellhouse, where he was laid down on his stomach on the bed while the restraints were removed. Dkt. 94-7. He was ordered not to move until the officers left the cell and the door was shut. *Id.*

According to his medical records, Mr. Bouye saw Nurse Murphy at 1:43 AM on June 29, 2021, approximately twelve hours after he was extracted from his cell. Dkts. 94-10 at 1, 94-4. He complained that he "was hit with the paintball gun on dayshift and was not given medical treatment." *Id.* Nurse Murphy noted that he had three small, circular abrasions on the left side of his chest and one 20 cm long abrasion on his left shoulder. *Id.* at 3. She also noted he was unable to open his right eye completely and there was an "accumulation of blood noted." *Id.* at 2. At 9:20 AM the same day, Mr. Bouye saw Dr. Knieser, who noted the same abrasions and broken blood

vessel in Mr. Bouye's right eye. *Id.* at 6. He also noted it "should clear in 1-2 weeks without permanent damage" and prescribed eye drops and an eye pad. *Id.*

### 2. **Mr. Bouye's Account**

In his deposition, Mr. Bouye described a slightly different interaction. Dkt. 94-1. As Sergeant Harris was doing count on June 28, 2021, around noon, she informed him he would be moving to a different cellhouse that day. *Id.* at 45. The cellhouse he would be moving to was a disciplinary cell house. *Id.* Mr. Bouye said he wasn't going to move. *Id.* Instead, he planned to "holler at the major or captain and try to get the move stopped" when he went to his mental health appointment at 1:00 PM. *Id.* However, Sergeant Harris told him he wasn't going to that appointment anymore but instead he was "moving or [] getting cell extracted." *Id.* at 56. Mr. Bouye felt he was "getting a raw deal" and told her "I'm not going anywhere. Y'all want to do anything with me, y'all going to drag me out of here. Y'all wrong." *Id.* Sergeant Harris told him if he wouldn't pack up his cell for the move then she was "going to have to pack it up." *Id.* at 57. At that point, Mr. Bouye realized "they [were] going to drag [him] out of [t]here." *Id.*

A couple hours later, Officer Williams arrived at his cell and Mr. Bouye heard him mumble something that he "didn't really exactly hear." *Id.* at 68, 91. Mr. Bouye turned to look at Officer Williams and was sprayed with enough Mace that the "whole room's filled up." *Id.* at 59. Mr. Bouye "did not say anything" to Officer Williams. *Id.* at 91. Once the room filled with Mace, Mr. Bouye couldn't breathe. *Id.* at 59. He threw his TV and fan at the corner of the cell door, breaking the TV. *Id.* at 94. He threw them not because he wanted to assault staff, but because he wanted to "let the other offenders know that they was coming in here to jump on me." *Id.* at 97. He also tried to get some water, but it was turned off. *Id.* at 107. Instead, he used the toilet water to wash his

face off. *Id.* Because he was still finding it difficult to breathe, he laid on the floor. *Id.* He repeatedly screamed that he couldn't breathe. *Id.*

Once the cell door opened, Mr. Bouye "jumped up off the floor" and tried to "rush through" the door and the officers entering the cell so he could "get out of this cell" and "get some fresh air" because he couldn't breathe. *Id.* at 110-112, 115. Mr. Bouye "never punched" an officer. *Id.* at 139. The officers entering the cell then pushed him back into the cell and onto his bed. *Id.* at 112. He felt "knees" and "hands" that were "bearing down on [him]" and "manhandling [him]" while he was "laying face down on the bed." *Id.* at 113, 117. He didn't know "who's doing what" but felt "a lot of pressure, a knee." *Id.* at 134. Mr. Bouye also didn't see any handcuffs out. *Id.* at 113.

Somehow, Mr. Bouye managed to "get to hold on to the [] door frame of the cell" with both hands while the officers had him "in the air trying to pull [him] back into the cell." *Id.* at 112. While he was holding onto the cell door frame, Officer Martz shot him with the pepper ball gun. *Id.* at 118.  He "heard the gun going off" and saw the pepper balls "bounced up off the floor" and "the little dust and debris coming off of them." *Id.* at 131-132. One hit Mr. Bouye in the shoulder, one nipped his ear, and one hit him in his right eye "and busted [his] blood vessel in [his] eye." *Id.* at 118. After he was hit with the pepper balls, he "dropped" and "let go of the door," falling to the ground. *Id.* While on the ground, the officers "put the handcuffs on [him] and the restraints, leg irons" and brought him to G Cellhouse. *Id.* Mr. Bouye testified that he didn't believe any additional force was used during the walk over, but did state that they walked him fast even though "the chains only go so far," which caused "tension in the walk" and made his hands go numb for weeks. *Id.* at 121-123.

Upon arrival at G Cellhouse, the officers took him to a shower. However, it "wasn't a decontamination shower. It was a regular shower that was in the cell house. The decontamination

shower is over in the medical center." *Id.* at 124. The officers read a decontamination card and "tried to force [his] face under the shower." *Id.* at 21, 120. But Mr. Bouye wasn't "underneath the water" in that shower because "once [his] face hit the water" and he knew "that the water was hot" he "pulled back" *Id.* at 127. Only "[a] few sprinkles may have hit the side of [his] face." *Id.* at 128. He pulled back because it burned. *Id.* at 22. It wasn't a proper decontamination shower because "[y]ou can't decontaminate pepper spray in a hot shower. It will only activate." *Id.* at 25. That's why it "needed to be in a controlled environment, a medical controlled environment." *Id.* 27. Mr. Bouye "refused that" and the officers confirmed he didn't want the shower before taking him to his new cell. *Id.* at 120. They informed him that he needed to lay face down on the bed without moving, and they would take the restraints off and leave the cell. *Id.* After they did, the cell door closed. *Id.*

Later that day, Mr. Bouye saw Nurse Jody, who "documented that [his] blood vessel was busted in [his] eye" and that he had marks from the pepper ball gun on his shoulder and ear. *Id.* at 23. However, despite what his medical records indicate, Mr. Bouye contends he did not see Dr. Knieser that day. *Id.* at 31. He recalls that after the incident, he was sent to both a disciplinary cell and placed on suicide watch. *Id.* at 32-35. He stayed on suicide watch for somewhere between three and six days and in the disciplinary cell for seven. *Id.* at 34-36. While he does recall "going over to the eye doctor" and "getting an eye exam" where he was given eyedrops, he does not believe it was as early as June 29, 2021, or even July 2, 2021, because he did not see the eye doctor until he had returned from both suicide watch and the disciplinary cell. *Id.* at 35-37. So, he could not have seen the eye doctor until "almost two weeks later." *Id.* at 37. While he does not remember the exact date he finally saw an eye doctor, he does not dispute that his medical records indicating he saw Dr. Kinsley on July 20, 2021, "could have been correct." *Id.* at 38.

### 3. *In Camera* Review of Video

In this case, the Court had the benefit of reviewing *in camera* a video and audio recording of the incident that forms the basis for Mr. Bouye's claims. *See* dkt. 94-6. The video evidence contradicts material aspects of Mr. Bouye's account of the events of June 28, 2021. It is a continuous recording of the cell extraction and subsequent decontamination shower, beginning when the extraction team gathered and walked to the Mr. Bouye's building, and ending once the extraction team returned to their gathering point after Mr. Bouye had been secured in his new cell. It lasts 24:26 minutes. The Court summarizes the video footage, below.

Defendants arrive at Mr. Bouye's cell at 2:08[3] and immediately ask him to submit to restraints, which Mr. Bouye refuses. *Id.* Sergeant Williams begins spraying OCV for four seconds. *Id.* at 2:18-2:22. Mr. Bouye then throws his fan at the cell door once and his TV at the door twice. *Id.* at 2:26-2:31. He tries to turn the sink on, and when it does not work, he then kneels by the toilet. *Id.* at 2:45-2:50. At 3:06, Mr. Bouye first states that he cannot breathe. *Id.* He then begins repeatedly yelling it. Defendants can be heard coughing during this time. At 3:34, an officer walks to the cell door and tells Mr. Bouye to cuff up. *Id.* Mr. Bouye continues coughing and lays on the ground. *Id.* at 3:45.

He continues to intermittently yell that he cannot breathe for about a minute, at which point Officer Quarrier, Officer Tyler, Officer Fawver, Officer Carter, and Sergeant Fish ("Cell Entry Defendants"), dressed in riot gear, go to the cell door. *Id.* at 4:55. Lieutenant Martz approaches the cell and aims the pepper gun at Mr. Bouye. *Id.* at 4:58. The cell door is opened at 5:00, and the Cell Entry Defendants attempt to enter. Mr. Bouye immediately stands up and lunges towards the officers, and Lieutenant Martz shoots pepper balls at Mr. Bouye three times. Mr. Bouye then

---

[3] The times in this summary refer to the time stamps on the video recording.

punches Officer Quarrier in the face, hitting his helmet. The Cell Entry Defendants push into the cell in a line formation, and Mr. Bouye is immediately pushed onto the bed. *Id.* at 5:04. The Cell Entry Defendants attempt to place restraints on Mr. Bouye while he physically resists. Mr. Bouye begins repeatedly stating again that he can't breathe, *id.* at 5:10, before asking "why you hitting?" *Id.* at 5:18. He then appears to begin pushing against the defendants in his cell, towards the hallway.

Mr. Bouye's head appears next to the cell door, bracing his arms on the outside of his cell door. *Id.* at 5:23. Defendant Martz immediately moves between Mr. Bouye and the camera and shoots him twice with the pepper gun. An officer inside the cell yells at Mr. Bouye to stop resisting. *Id.* at 5:29. At this point, he is loosely held under his jaw by an officer, his head and shoulders outside the cell door, with his body being held approximately halfway up the cell door. Roughly ten seconds later, Mr. Bouye states something unintelligible and then releases his arms from where they had been braced, telling the officers "all you need to do is cuff me up." *Id.* at 5:38. The Cell Entry Defendants lower him to the ground while Mr. Bouye yells that he is not resisting. Mr. Bouye is placed on the ground on his side. *Id.* at 5:50. The Cell Entry Defendants attempt to cuff him, simultaneously trying to flip him to his stomach and get his arms behind his back. One officer appears to twist his right arm and pull it back at an awkward angle while telling him to stop resisting. Mr. Bouye responds that all they need to do is stop twisting his arm and he will cuff up. When they get him on his stomach, they are able to secure restraints on Mr. Bouye while he continues to lay on the ground and yell that he is not resisting. *Id.* at 6:11. One of the officers states that he is secure while another tells him that he needs to calm down. *Id.* at 6:20. Mr. Bouye again repeatedly yells that he can't breathe, while still on the ground. *Id.* at 6:30. Defendants stand him up and walk briefly down the hall. *Id.* at 6:46.

While walking down the hall, Mr. Bouye continues to yell that he cannot breathe while multiple people can be heard coughing. Nurse Gust is then called to approach Mr. Bouye. Nurse Gust visually inspects Mr. Bouye's face while Mr. Bouye is bent over and yelling that he can't breathe. *Id.* at 7:15. Nurse Gust asks Lieutenant Martz where he hit Mr. Bouye, and Lieutenant Martz states his torso. *Id.* at 7:20. Mr. Bouye yells that Lieutenant Martz hit him in his face. Nurse Gust tells Mr. Bouye to stand up, which Mr. Bouye refuses to do. *Id.* at 7:23. Nurse Gust then states that Mr. Bouye is fine. Defendants begin walking Mr. Bouye down the stairs and out of the building, while Mr. Bouye continuously yells that he can't breathe and has asked for mental health. *Id.* at 7:32.

While walking outside, multiple officers can be heard telling Mr. Bouye to stand up so that he can breathe better. Mr. Bouye responds that the officers have him bent over, and a female officer responds that no one is forcing him down. *Id.* at 9:04. At 9:23, everyone stops walking for a moment, and Mr. Bouye can be seen bent over, with an officer on each side holding his arms up at near shoulder height. *Id.* He again begins repeating that he can't breathe, this time without yelling.

Everyone enters the new building, *id.* at 11:03, and ascend the stairs before stand outside the shower. *Id.* at 12:35. An officer tells Mr. Bouye he needs to ask him questions for his safety. Mr. Bouye states multiple times that he can't breathe. The officer responds that as soon as he answers the questions they will get him cleaned up. Mr. Bouye states that he isn't going to answer any questions because they aren't following procedures, and then says, "I'm not refusing, I'm just telling you." *Id.* at 13:06-13:14. He states that he can't answer anything if he can't breathe and he should be taken to a hospital. One of the extraction team members is seen taking photographs of Mr. Bouye's chest and then his face. *Id.* at 13:21.

Multiple officers move Mr. Bouye to the shower doorway, with his head bent into the shower room. *Id.* at 14:04. An officer is heard telling them to put him in as he is and someone asks him if he wants a shower or not. Mr. Bouye repeatedly states that he "can't do this here." The shower begins at 14:26. Almost a minute later, Mr. Bouye states that it is still burning and then asks how he gets the burning out. *Id.* at 15:16-15:28. Defendant Martz tells him that it is going to burn for a while and he just needs to rinse it off. *Id.* at 15:46. Mr. Bouye tells Lieutenant Martz "I'm trying to, bro, I said that I was done resisting," and Lieutenant Martz responds that he knows and "you're with us until we put you into the cell, per policy." *Id.* at 15:50. Mr. Bouye again states that it is still burning, and Lieutenant Martz responds again, explaining "it's gonna burn, the shower is just to get the contaminant off the skin, the burning is your body processing it" and that Mr. Bouye is "going feel it burn for hours." *Id.* at 16:02. Lieutenant Martz asks Mr. Bouye if he's done with his shower, *id.* at 16:30, and he responds, "yes I guess so." *Id.* at 16:38. Everyone then moves to the new cell. *Id.* at 17:54. An officer is heard directing Mr. Bouye to lay on the bed. Mr. Bouye asks how they would like him to lay down. *Id.* at 17:58. He repeats that he said resisting is over, and says "this is lawsuit time." *Id.* at 18:46. All officers exit the new cell, *id.* at 19:43, and the cell door closes. *Id.* at 19:48. Mr. Bouye does not rise from the bed until the cell door closes.

The extraction team then leaves the building. They arrive at the beginning gathering location, *id.* at 23:35, and Sergeant Williams begins a verbal summary of the extraction event. He asks if there are any injuries to report and no one verbally answers. *Id.* at 24:20. Nurse Gust is seen shaking his head slightly. The video terminates at 24:26.

### III. Discussion

Mr. Bouye claims that Lieutenant Martz, Sergeant Harris, Sergeant Williams, Sergeant Byers, Sergeant Fish, Officer Alderson, Officer Quarrier, Officer Carter, Officer Tyler, Officer

Fawver, and Nurse Gust used excessive force and/or failed to intervene and were deliberately indifferent to a serious medical need in violation of his Eighth Amendment rights when he was injured during a cell extraction and denied proper medical treatment.

### A.  Excessive Force Claims

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell,* 933 F.3d at 662.  This rule does not bar de minimis force unless the force is "of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37−38 (2010) (per curiam) (cleaned up). Even if the force applied is not de minimis, it remains permissible if used "in a good-faith effort to maintain or restore discipline." *McCottrell*, 933 F.3d at 664 (cleaned up).  But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good- faith and malicious force, courts consider a number of factors, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* at 663; *see also Whitley v. Albers*, 475 U.S. 312, 321 (1986). These factors are sometimes referred to as the "*Whitley* factors." To survive summary judgment, a plaintiff must also present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

### 1. Defendants Harris, Alderson, Byers, and Gust

The Court's review of the record indicates that Defendants Harris, Alderson, Byers, and Gust were not involved in any use of force administered to Mr. Bouye. Dkt. 94-6 (video). Sergeant Harris was not present during any portion of the cell extraction. Officer Alderson was operating

the camera and thus only participated in the extraction as an observer. Dkt. 94-4. Sergeant Byers

and Nurse Gust are seen in the video, but they do not physically interact with Mr. Bouye at any

time. Sergeant Byers was the scribe and is only seen for a few seconds while holding a clipboard

with a sheet of paper on it. Dkt. 94-6 at 0:01-0:05, 7:00-7:04. Nurse Gust visually inspects Mr.

Bouye but never touches him. *Id.* at 7:06-7:7:30.

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged

constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (internal

quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983

creates a cause of action based on personal liability and predicated upon fault. An *individual* cannot

be held liable in a § 1983 action unless he caused or participated in an alleged constitutional

deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained

of and the official sued is necessary.")). Because no reasonable juror could find that Defendants

Harris, Alderson, Byers, and Gust personally used excessive force on Mr. Bouye on June 28, 2021,

they are entitled to summary judgment on this claim.

### 2. Defendants Williams, Martz, Quarrier, Carter, Tyler, Fawver, and Fish

Applying the *Whitley* factors to each instance of force used on June 28, 2021, Defendants

Martz, Quarrier, Carter, Tyler, Fawver, and Fish are entitled to summary judgement. Defendant

Williams is not entitled to summary judgment.

#### a. Defendant Williams

In the afternoon of the incident, Sergeant Harris informed Mr. Bouye that he would need

to move to another cellhouse later in the day. Dkt. 94-1 at 45, 94-2 at 1. However, Mr. Bouye

refused because didn't want to go to a disciplinary cellhouse, telling Sergeant Harris "I'm not going

anywhere. Y'all want to do anything with me, y'all going to drag me out of here. Y'all wrong." Dkt.

94-1 at 45, 56. A cell extraction team was subsequently assembled to remove Mr. Bouye from his cell. Dkt. 94-4. The team arrived at Mr. Bouye's cell and Sergeant Williams ordered him twice to "come here" and to submit to restraints. Dkts. 94-5, 94-6 at 2:08. When Mr. Bouye refused and complained that policy wasn't followed , Sergeant Williams sprayed OCV into his cell for approximately four seconds using a "fogger".[4] Dkts. 94-6 at 2:18-2:22; 94-1 at 93. This "saturated" the cell with mace. Dkt. 94-1 at 91. Mr. Bouye threw his fan and TV at the cell door, before laying on the ground. Dkt. 94-6 at 2:26-2:31. Approximately a minute after the fogger was used, Sergeant Williams again asked him to submit to restraints. *Id.* at 3:34. Mr. Bouye ignored him. *Id.*

It is not cruel and unusual punishment to use "mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). A prison officer may use small amounts of pepper spray to compel a disobedient prisoner to leave a cell. *Id.*; *see also Rice ex rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 668 (7th Cir. 2012) (where prisoner had hit his cellmate and refused to comply with order to leave cell, use of pepper spray was justifiable). But "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270.

Given Mr. Bouye's responses to both Sergeants Harris and Williams, no reasonable juror could disagree that some amount of force was needed to move Mr. Bouye from his cell. *See id.* However, it is not so clear that the amount of pepper spray used by Sergeant Williams – enough to saturate Mr. Bouye's entire cell – was needed at that point to persuade Mr. Bouye to comply with the order to submit to restraints. Four seconds is "a significantly more serious dose of pepper

---

[4] This is the only instance of force used by Sergeant Williams.

spray" than is often used on inmates. *Moore v. Andrews,* 2022 WL 672750 at *4 (S.D. Ind., Mar. 7, 2022).

A reasonable juror could find that, when he used the pepper spray "fogger" for four seconds without first trying a shorter burst of spray, Sergeant Williams applied the pepper spray "in quantities greater than necessary," *id.* at *5, when all Mr. Bouye had done at that point was refuse to leave his cell. *See id.* (officer granted summary judgment when he initially utilized one second burst of pepper spray, but denied summary judgment when he returned and used it for four seconds); *see also Jackson v. Angus,* 808 F. App'x. 378, 380 (7th Cir. 2020) (summary judgment granted when officer used two short bursts of pepper spray); *Kervin v. Barnes,* 144 F. App'x 551, 552 (7th. Cir. 2005) (claim screened out when officer used one second burst of pepper spray); *Sanders v. Fredricks,* 2016 WL 8711472 at *6 (N.D. Ill. January 8, 2016) (summary judgment granted when officer deployed two bursts of pepper spray in response to a threat to officer safety). *Soto,* 744 F.2d at 1270. Therefore, Sergeant Williams is not entitled to summary judgment.

### b. Defendants Martz, Quarrier, Carter, Tyler, Fawver, and Fish

After Sergeant Williams ordered Mr. Bouye to submit to restraints a second time and he did not, Defendants Quarrier, Carter, Tyler, Fawver, and Fish ("Cell Entry Defendants") approached the cell door, ready to enter. Dkt. 94-6 at 4:55. Lieutenant Martz stood at the cell and aimed the pepper ball gun. *Id.* at 4:58. When the Cell Entry Defendants attempted to enter, Mr. Bouye immediately stood up and lunged towards them. *Id.* at 5:00. Within four seconds, Lieutenant Martz shot the pepper ball gun at Mr. Bouye three times, Mr. Bouye punched an officer three times, and the Cell Entry Defendants pushed Mr. Bouye back onto the bed in his cell. *Id.* at 5:00-5:04. While Mr. Bouye's deposition testimony is that he did not assault any staff, that testimony is plainly contradicted by the video evidence. *Id.*

i.  *Entry into Mr. Bouye's Cell*

As it relates to the Cell Entry Defendants pushing into the cell, it is difficult to imagine what else they could have done to temper the use of force when met with Mr. Bouye's conduct. Mr. Bouye refused to submit to restraints voluntarily, and the moment the Cell Entry Defendants entered the cell Mr. Bouye began throwing punches. In response, they pushed him onto the bed. No reasonable juror could find this was an unreasonable or excessive use of force in response to being punched.

Likewise, no reasonable juror could find Lieutenant Martz used excessive force in shooting the pepper ball gun at Mr. Bouye as the Cell Entry Defendants were pushing into the cell. Lieutenant Martz attests he was attempting "to stop Bouye's aggressive advance toward the team" and hit Mr. Bouye with pepper balls 2-3 times in the torso area. Dkt. 94-8 at 2. The video shows a great deal of movement, including Mr. Bouye clearly punching an officer, in this very short period of time.

Thus, there was a clear need to apply force, Lieutenant Martz shot the same number of pepper balls as Mr. Bouye threw punches, and he did so in response to a reasonably perceived threat to the team's safety. *See, e.g., Weeks v. Warden*, No. 15 C 5234, 2017 WL 3404965, at *8 (N.D. Ill. Aug. 7, 2017) ("[I]t is unclear why a warning would be needed in this situation. It was not as if Plaintiff was engaging in some innocuous pursuit when the pepper spray was used, such that he would have been surprised by the spray. Instead, he was engaging in behavior that violated prison rules and posed an obvious threat to… staff."); *Sanders,* 2016 WL 8711472, at *6 ("It then took two additional correctional officers along with a second set of handcuffs to restrain" plaintiff because he "was not incapacitated, or even slowed down much, by the pepper spray and thus . . . use of pepper spray appears to have been *de minimus* given the totality of circumstances[.]").

Further, Mr. Bouye's testimony is silent as to this use of pepper balls, allowing the reasonable inference that he also did not sustain any serious injuries.

>    ii.   *Struggle in the cell/on the bed*

Mr. Bouye is no longer visible on the video once he was pushed onto the bed by the Cell Entry Defendants. He asserts he felt "knees" and "hands" that were "bearing down" and "manhandling" him. Dkt. 94-1 at 113, 117. Because he was laying face down on the bed, he "can't say if it was punching." *Id.* at 113. However, despite this testimony, he can be heard on the video asking "why you hitting?" Dkt. 94-6 at 5:18. During this struggle, Mr. Bouye did not see any handcuffs. Dkt. 94-1 at 113. He stated that the "only thing [he] was trying to do is get some fresh air instead of keep on breathing in" the pepper spray because "the stuff was all over [him]." *Id.* at 114-115.

Even drawing all reasonable inferences in the light most favorable to Mr. Bouye, no reasonable juror could find any of the defendants used excessive force while holding him down on the bed. While the force used to enter the cell and the force used to hold him on the bed are separate uses of force, Mr. Bouye's actions moments before do not exist in a vacuum. He punched one of the officers mere seconds before the Cell Entry Defendants pushed him onto the bed. Dkt. 94-6 at 5:00-5:04. Further, roughly 20 seconds later, his head appears next to the cell door after having pushed past all of the Cell Entry Defendants. *Id.* at 5:23. Even assuming the officers hit him while trying to restrain him on the bed, no reasonable juror could conclude that force was not needed, an appropriate level of force was not used, or the officers did not reasonably perceive a threat to their safety. A use of force is not excessive merely because it inflicts a degree of pain, scratches or lacerations, or burning sensations from chemical spray, and Mr. Bouye has not designated evidence supporting "a reliable inference of wantonness in the infliction of pain" by the Cell Entry

Defendants while they were attempting to restrain him on his bed. *Whitley*, 475 U.S. at 322; s*ee also Outlaw v. Newkirk,* 259 F.3d 833, 839 (7th Cir. 2001) ("[T]he minor nature of [Plaintiff]'s injuries strongly suggests that the force applied by [Defendants] was *de minimis*.").

### iii.   Mr. Bouye Pulling Himself Out of the Cell

Mr. Bouye somehow managed to get to the cell door and "hold on to the frame" after he pushed on the bed. Dkt. 94-1 at 112. While Mr. Bouye braced both arms on the outside of the cell door, the Cell Entry Defendants "got [him] in the air trying to pull [him] back in the cell" while Mr. Bouye was "trying to come out of it." *Id.* Lieutenant Martz momentarily obstructs the camera's view, but the pepper gun can be heard. Dkt. 94-6 at 5:24. An officer still inside the cell yells at Mr. Bouye to stop resisting, while another officer has his arm loosely under Mr. Bouye's jaw and around the back of his head. *Id.* at 5:29. Mr. Bouye testified that he "heard the [pepper ball] gun going off" and saw the pepper balls "bounced up off the floor." Dkt. 94-1 at 131-132. He was hit in the shoulder, the ear, and his right eye, which "busted [the] blood vessel in [that] eye." *Id.* at 118. Roughly fifteen seconds after he was hit with the pepper balls, Mr. Bouye "dropped" and "let go of the door," telling officers "all you need to do is cuff me up." Dkt. 94-6 at 5:23-5:38, 94-1 at 118. The Cell Entry Defendants then lower him to the floor and placed him on his side. Dkt. 94-6 at 5:50.

Mr. Bouye concedes that he was "trying to pull [him]self out of the cell" after "swim[ming his] way through the crowd."  Dkt. 94-1 at 60-61. It would be unreasonable to expect the officers, whose job it is to preserve internal order and maintain institutional security, to let Mr. Bouye leave the cell unrestrained in this situation. As such, it is difficult to see what else they could have done. No reasonable juror could conclude that the Cell Entry Defendants used excessive force while trying to pull him back into the cell. Nor could a reasonable juror find that Lieutenant Martz

maliciously or excessively used force when using the pepper ball gun. While Mr. Bouye was hit

in the eye, he also testifies that he saw the pepper balls bounce off the floor before hitting him. *Id.*

at 131-132. Thus, while Lieutenant Martz may have hit him in his eye, he was not aiming at it and

intentionally doing so. He was not malicious in his use, and given the active struggle between Mr.

Bouye and the Cell Entry Defendants where Mr. Bouye was admittedly trying to exit his cell, and

appeared not to be affected by the initial use of pepper balls,  Lieutenant Martz's additional use of

the pepper ball gun was not excessive. *See Littler v. Shriner,* 2013 WL 4788123 at *4 (N.D. Ind.,

Sept. 9, 2013) ("Moreover, this is not a situation where the use of chemical agents continued to be

utilized after an inmate complied with orders. [Plaintiff] continuously refused to obey orders even

after the various chemical agents were employed.").

### iv.  *Placing Mr. Bouye in Restraints*

Once Mr. Bouye was on the ground, he testified that "that's when [the officers] put the

handcuffs on me and the restraints, leg irons" before escorting him out of J Cellhouse. Dkt. 94-1

at 119. While the video shows that there was some awkward twisting of Mr. Bouye's arm at one

point, once he is moved to his stomach instead of his side the officers are able to secure him without

complaint. Dkt. 94-6 at 5:50-6:20.

It is not clear that Mr. Bouye makes any arguments that any officers used excessive force

while applying restraints after he stopped resisting. *See* dkt. 94-1 at 135 ("The excessive point

comes when y'all all come up in the cell where you spray me with that Mace and fill up the whole

cell. Y'all all piled up on top of me. So anything after that, I can't say."). To the extent he does

intend to make such an argument, no reasonable juror could find that any officers used excessive

force in that instance.

### B. Deliberate Indifference to Serious Medical Need

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Even assuming Mr. Bouye had an objectively serious medical need resulting from exposure to the pepper spray, he has not designated sufficient evidence to support a reasonable inference that any defendant was deliberately indifferent to his medical needs.

### 1. Defendant Nurse Gust

Deliberate indifference requires more than negligence or even objective recklessness. *Petties v. Carter,* 836 F.3d 722 (7th Cir. 2016). Rather, Mr. Bouye "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* at 728. Further, for medical professionals, treatment decisions must depart so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Id.* at 729. In other words, "unless no minimally competent professional" would have responded to the situation in the same way, the medical professional is entitled to deference. *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (cleaned up).

After Mr. Bouye was properly restrained, officers on the extraction team requested that Nurse Gust visually inspect Mr. Bouye for injuries. Dkt. 94-6 at 7:11-7:15. Nurse Gust requested that Mr. Bouye stand up in order to have a better view, but Mr. Bouye refused. *Id.* 7:23. Nurse Gust remained bent over and concluded his visual inspection, clearing Mr. Bouye to continue his transfer to the new cellhouse. *Id.* at 7:30. Afterwards, Mr. Bouye was able to walk to another building while restrained and up multiple flights of stairs before receiving his decontamination shower. *Id.* at 7:32-12:35. Mr. Bouye asserts that he "wasn't underneath the water" in the shower, dkt. 94-1 at 127, but the video clearly shows his entire head and face covered in water during the shower. Dkt. 94-6 at 14:26-16:38. Further, he provides no support for his claim that a decontamination shower must be taken in the medical center. Dkt. 94-1 at 124.

Nurse Gust examined Mr. Bouye as best he reasonably could while Mr. Bouye remained bent over, refusing to stand up and give Nurse Gust a better view of the eye injury he complained about. There is no evidence in the record that Nurse Gust's subsequent determination that Mr. Bouye was able to be moved to his new cell without medical intervention was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006). Indeed, after Nurse Gust cleared Mr. Bouye to continue walking to the other cellhouse, he was in fact able to do so without any additional injury or harm.

Additionally, Mr. Bouye's assertions regarding the lack of a decontamination shower to flush out his eyes are clearly contradicted by the video. Further, to the extent Mr. Bouye argues the decontamination shower must be taken in the medical unit, there is no evidence to support this claim, nor is there any evidence that he was exposed to a significant risk of harm by taking the decontamination shower in the cellhouse. *See Hughes v. Durrent,* 2017 WL 3978702 at *10 (N.D.

Ill., Sept. 11, 2017) (treating doctor testified "the standard care for exposure to OC pepper spray is to flush out the eyes, which can be done by non-medical personnel.").

As such, no reasonable jury could find that Nurse Gust was deliberately indifferent to a known serious risk to Mr. Bouye's health.

### 2. Non-Medical Defendants

It is a high burden to prove prison officers were deliberately indifferent. "Deliberate indifference is more than mere negligence or carelessness: it is 'something approaching a total unconcern' for inmate safety." *Hunter v. Mueske,* 73 F.4th 561, 566 (7th Cir. 2023) (quoting *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012)); *Huber v. Anderson,* 909 F.3d 201, 208 (7th Cir. 2018) (deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.") (internal quotation omitted). Failing to choose "the best course of action does not amount to a constitutional violation." *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir. 2002). Further, the Seventh Circuit has made clear that, "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011).

Upon successfully restraining him, officers halted movement and called Nurse Gust over to inspect Mr. Bouye when he continued to yell that he couldn't breathe. Dkt. 96-4 at 6:46-7:11. Once cleared, the extraction team escorted Mr. Bouye to the shower in G Cellhouse, asked him the required decontamination questions, and offered him a shower, which he took. *Id.* at 7:32-16:38. Mr. Bouye spoke with officers multiple times during this period and was asked if he had finished the decontamination shower before any officer turned the water off. *Id.*

Mr. Bouye did communicate that the burning sensation from the pepper spray continued after being placed under the water. However, despite Mr. Bouye's allegations that the hot water used in the shower reactivated the pepper spray, there is no evidence in the record to support this claim. Further, even if it were true, there is evidence to support that the officers believed the continued burning sensation Mr. Bouye felt was the result of the normal pepper spray process, and not due to using hot water. *See* Dkt. 94-6 at 15:16-16:30 (conversation between Mr. Bouye and Lieutenant Martz where Lieutenant Martz explains "it's gonna burn, the shower is just to get the contaminant off the skin, the burning is your body processing it"). Further, Nurse Gust remained with the officers and Mr. Bouye for the entire extraction and shower. *See generally* dkt. 94-6.

No reasonable juror could find that any of the extraction team officers even remotely approached "a total unconcern" for Mr. Bouye's safety. *Hunter,* 72 F.4th at 566.

### C. Failure to Intervene

No evidence in the record suggests that any other defendant knew Sergeant Williams was going to utilize the pepper spray for four seconds during its initial deployment, nor is there evidence to support the notion that they could have done anything to stop him in the short time they would have had available between realizing how long he intended to use the fogger and when he stopped. As to the rest, because the Court has not found any underlying claims for excessive force or deliberate indifference, any related claims for failure to intervene are without merit. *Filmore v. Page,* 358 F.3d 496, 506 (7th Cir. 2004) ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention.) Therefore, all defendants are entitled to summary judgment on any failure to intervene claim.

## IV. Conclusion

The defendant's motion for summary judgment, dkt. [93], is **DENIED** as to the excessive force claim against Defendant Williams. The defendants' motions for summary judgment, dkts. [88] and [93], are **GRANTED** as to all other defendants and claims. All Eighth Amendment claims against Defendants Alderson, Byers, Carter, Harris, Fawver, Fish, Martz, Quarrier, Tyler, and Gust are **dismissed with prejudice**. Partial final judgment will not enter at this time.

The **clerk is directed** to terminate Defendants Alderson, Byers, Carter, Harris, Fawver, Fish, Martz, Quarrier, Tyler, and Gust from the docket.

The excessive force claim against Sergeant Williams will be resolved by settlement or trial. The Court *sua sponte* reconsiders Mr. Bouye's motion for counsel, dkt. 23, and will attempt to recruit counsel to represent Mr. Bouye through final judgment. However, **the clerk is directed** to send Mr. Bouye a form motion for assistance with recruiting counsel because this form contains the terms and conditions of accepting counsel. Mr. Bouye must complete the form and return it no later than **March 12, 2024**. The Magistrate Judge is requested to set the matter for a telephonic status conference once recruited counsel has appeared.

**IT IS SO ORDERED.**

Date: 2/20/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

BRADFORD DEAN BOUYE, JR.
914329
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com